# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**FILED**

**December 17, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| **GENEVIEVE M. DIX,** | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | Shelby Circuit No. 142710 R.D. |
| Appellant, | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAMES A. CARSON,** | ) | Appeal No. 02A01-9704-CV-00093 |
| | ) | |
| Defendant/Counter-Plaintiff | ) | |
| Appellee. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
## AT MEMPHIS, TENNESSEE

## THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiff/Counter-Defendant          For the Defendant/Counter-Plaintiff
Appellant:                                                     Appellee:

Genevieve M. Dix                                        Jerry F. Taylor
Attorney Pro Se                                           Deborah L. Pagan
Memphis, Tennessee                                  Arch B. Boyd
                                                                      Memphis, Tennessee

**AFFIRMED IN PART, REVERSED
IN PART, MODIFIED AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is a divorce case. After a lengthy trial, the trial court, among other things, divided the marital estate, declined to award child support and awarded the parties joint custody of their minor child. We affirm in part, reverse in part, modify and remand.

Following a six-year courtship, Plaintiff/Appellant Genevieve M. Dix ("Wife"), an attorney, and Defendant/Appellee James A. Carson ("Husband"), a mediator and construction contractor/consultant, married in 1986. The parties' only child, a daughter, McKenzie Carson, was born in 1988. Wife filed for divorce in 1993.

The litigation in this divorce eventually escalated into an unduly mammoth proceeding. Husband changed attorneys several times and Wife, after retaining counsel for a time, eventually represented herself. For various reasons, the identity of the trial judge changed several times. The record is replete with allegations by both parties of threats, adultery, use of illegal narcotics, concealment of assets, harassment, kidnapping, mental illness, physical violence and perjury. Prior to trial there were numerous proceedings on petitions and motions, primarily filed by Wife, to compel discovery, for injunctive relief, accountings and for contempt of court. Husband filed a bankruptcy petition. Wife allegedly deposed Husband for over fifty hours. Three years after the petition for divorce was filed, the trial was held. The nine-day trial resulted in seventeen volumes of transcript and one hundred twenty-five exhibits. Husband's testimony, including cross-examination by Wife, is approximately five volumes of transcript. Wife's testimony is approximately six and one-half volumes of transcript.

At the time they married, Wife was 37 years old and Husband was 48 years old. Both had been married previously, and went into the marriage with assets. During the marriage, the parties owned several parcels of real property. Husband asserts that he owned substantial equity in most of these prior to the marriage. Husband contends that, prior to the marriage, he owned the parties' marital home at 3984 Tutwiler in Memphis, Tennessee, and several rental properties in Shelby County, Tennessee: 5657 Raleigh-LaGrange Road, 2851 Shelby Street, and 5530 Summer Avenue. Husband also maintains that, prior to the marriage, he owned the real property located at 1701 Patricia Street in Key West, Florida. Prior to the marriage, Wife owned a home at 334 Buena Vista in Memphis. During the marriage the parties also owned the property at which Wife's law office was located, at 230 Adams Avenue in Memphis, as well as a partial interest in an apartment complex in Memphis. During the marriage, Husband and Wife executed deeds so that all of the real property

would be owned by both as tenants by the entireties.

After the parties' daughter McKenzie was born in 1988, both Husband and Wife were involved in child-rearing, although the parties disagree as to which of them was the primary caretaker. They agreed to enroll McKenzie in a private, all-girls school in Memphis, St. Mary's Episcopal School. It is undisputed that McKenzie has done well at St. Mary's.

After the parties separated, Wife filed for divorce and sought sole custody of McKenzie. During the pendency of the litigation, McKenzie has alternated weeks with each parent. The parties entered into a consent order for Husband to pay child support to Wife during the pendency of the litigation. Husband paid no child support to Wife, but argued that his arrearage was offset by other monies spent on McKenzie.

In the divorce proceedings, both parties sought sole custody of McKenzie. The trial court appointed a guardian ad litem to report on the issue of custody. The guardian ad litem reviewed numerous documents, including psychological evaluations of Husband and Wife, and interviewed Husband, Wife, McKenzie's teacher and other witnesses. Based on her investigation, the guardian ad litem recommended that sole custody be awarded to Wife, but retain the same allocation of parenting time between the parents, that is, alternating weeks with each parent. The guardian ad litem also recommended that McKenzie continue attending St. Mary's Episcopal School.

As noted above, the trial in this cause was unduly lengthy, lasting nine days. Most of the evidence consisted of Wife's testimony and Wife's examination of Husband and other witnesses. On the real property at issue, Wife testified that she had contributed substantially to the properties in which Husband had owned an interest prior to the marriage. She contended that mutual affection motivated the deeds conveying Husband's interest in the real property to Husband and Wife as tenants by the entireties. Wife asserted that Husband had engaged in a pattern of dissipating assets and hiding income. She argued that Husband owed rent to the "marital estate" for his use of jointly owned property after the parties' separation. She maintained that Husband had committed adultery before and after the parties' separation and was at fault for the demise of the marriage.

Wife also sought sole custody of the parties' daughter McKenzie. She asserted that she had been McKenzie's primary caretaker, both before and after the parties' separation. Wife testified about numerous incidents in which Husband had been verbally abusive to Wife and even physically threatening. She said that she acquiesced in the arrangement of McKenzie spending alternating

2

weeks with each parent only because Husband had "kidnapped" McKenzie from school without Wife's knowledge and not told Wife where he and McKenzie were, or even that she was with him. She said she agreed to the arrangement only to prevent further stress to McKenzie.

Wife testified that Husband frequently left town unexpectedly during times in which McKenzie was scheduled to be with him. Wife said that this resulted in Wife being forced to quickly change her plans in order to care for McKenzie and created uncertainty and insecurity in the child. Wife testified that Husband refused to talk with her about any topic, including McKenzie, and had even installed call blocking on his telephone to block Wife's telephone calls for a substantial period of time. Wife accused Husband of using illegal drugs and consorting with a convicted felon and drug user.

Wife also argued that McKenzie should be kept in the same private school, St. Mary's Episcopal School, and that Husband should be required to pay his fair share of the tuition. She contended, based on her evidence, that Husband was hiding income and dissipating assets, and that Husband should be required to pay her child support in the future, as well as the arrearage in child support from the consent pendente lite order.

In his testimony, Husband maintained that Wife is mentally ill. In support of this assertion, he cited Wife's excessive behavior representing herself in the divorce proceedings, including numerous petitions and motions, excessive discovery, harassment of witnesses, and deposing Husband for over fifty hours. He also contended that Wife had stalked him and had harassed the court-appointed certified public accountant. He asserted that Wife's repeated harassing telephone calls to Husband's home forced him to get call blocking to block calls from Wife. He maintained that McKenzie could reach him by using his pager. He calculated that he had cared for McKenzie at least sixty-one percent of the time since the parties separated. Husband testified that he had been an involved parent since McKenzie was born. He testified that he had taken McKenzie to numerous activities and classes, and that he enrolled her at St. Mary's Episcopal School as an infant, several years before she was to start school.

On the property division, Husband testified that both parties came into the marriage with property. He testified that, prior to the marriage, Wife owned the house on Buena Vista, her savings and her pension. Husband stated that, prior to the marriage, he owned the marital home on Tutwiler, the house in Key West, Florida, and the rental property in Shelby County on Shelby Street, Summer Avenue and Raleigh-LaGrange Road. Husband testified that the properties in his name were placed in both parties' names because Wife fraudulently advised him to do so, purportedly to protect the property from creditors. He asserted that Wife's income from her law practice had increased greatly during the marriage, to over $100,000 per year, while his income has decreased to less than $25,000 per year because of the divorce litigation. Husband acknowledged not having paid to Wife the child support set forth in the consent pendente lite order, but maintained that this was offset by his other expenditures for McKenzie, such as etiquette classes, swimming lessons, piano lessons, tutors, entertainment and clothing.

After the trial, the trial court declared the parties divorced pursuant to Tennessee Code Annotated § 36-4-129, without attributing fault to either party. The trial court found both parents to be fit, and found that the custody arrangement pending trial had been "successful." Both parties were awarded joint custody with Wife being awarded physical custody. The trial court awarded Husband the "same liberal visitation as he has had in the past three years," holding that each party should continue to keep McKenzie on alternating weeks. The trial court did not hold either party responsible for child support and declined to require Husband to pay expenses for McKenzie's tuition at a private school. The trial court noted that Wife had paid for health insurance for McKenzie, and ordered Husband to pay for half the premium and half of any medical expenses not covered by insurance. The trial court also found that any balance Husband owed for child support was offset by his expenditures on McKenzie.

The trial court also divided the marital estate. The trial court divided the real property owned by the parties. Noting that Husband had occupied the marital home on Tutwiler for many years prior to the parties' marriage, the trial court awarded the marital home to Husband. The trial court also awarded Husband the Key West property, although it found that "both parties contributed to improvements, maintenance and upkeep" of the Florida property. The proceeds from the sale of the property on Adams Avenue were awarded to Wife, and Wife was awarded the home at 266 Hawthorne in which she lived at the time of trial. The remaining properties were ordered sold and

4

the proceeds divided equally between the parties. The personal property was divided by awarding it to the party in possession of the property at the time of the final decree. The trial court ordered that each party pay his or her own attorney's fees and held that costs should be divided equally. From this decree, Wife now appeals.

On appeal Wife argues that the trial court should have awarded her sole custody of McKenzie. Wife contends that the trial court should have required Husband to pay child support, both arrearages and in the future, and maintain a life insurance policy for the benefit of the child. Wife also asserts that Husband should be required to contribute to the cost of McKenzie's private school tuition and expenses.

In addition, Wife contends that the trial court should have granted the divorce to her on the grounds of adultery and/or inappropriate marital conduct. Wife challenges the trial court's division of the marital estate and asserts that the trial court failed to render and consider an accounting of the marital property. Finally, Wife seeks her attorney's fees and court costs at the trial level and on appeal.

Our review of this case is *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. *See* Rule 13(d) of the Tennessee Rules of Appellate Procedure. No presumption of correctness attaches to the trial court's conclusions of law. ***See Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn. 1995).

On appeal, Wife asserts that the trial court erred by declaring the parties divorced pursuant to Tennessee Code Annotated § 36-4-129. She argues that the court should have awarded the divorce to her on the grounds of adultery or inappropriate marital conduct. The trial court noted that Husband admitted committing adultery "beginning some three years after the separation," but found insufficient proof of prior acts of infidelity by Husband. Wife maintains that there is no evidence in the record of fault on behalf of Wife and that the preponderance of the evidence does not support the trial court's determination that Wife has failed to prove other acts of Husband's infidelity. Husband points to his testimony of numerous incidents of inappropriate marital conduct by Wife, including testimony that Wife threatened Husband, and engaged in inappropriate conduct towards third parties such as tenants and the parties' accountant.

The trial court's assessment of the evidence on fault necessarily involves a determination of the parties' credibility:

5

> In [a] nonjury case, the trial judge as the trier of fact ha[s] the opportunity to observe the manner and demeanor of all of the witnesses as they testif[y] from the witness stand. The weight, faith, and credit to be given the witnesses' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.

*Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The record includes evidence of inappropriate marital conduct by both parties. Under these circumstances, the trial court did not err in declaring the parties divorced pursuant to Tennessee Code Annotated § 36-4-129.

Wife challenges the trial court's division of the marital estate. The trial court awarded Husband the marital home, as well as the real estate in Key West, Florida. The net equity of the marital home was $92,500 and the net equity of the Key West property was $252,000. The trial court awarded the proceeds of the sale of Wife's law office on Adams Avenue to Wife. Wife was also awarded a home at 266 Hawthorne that she acquired during the marriage and in which she lived at the time of trial.[1] Although, the trial court did not make a finding on the net equity of property awarded to Wife, her undisputed evidence indicates that the Adams Avenue property was sold for $128,662.67. Three other parcels of real estate located on Summer Avenue, Raleigh La-Grange Road, and Shelby Street, with a combined net equity of approximately $322,400, were sold and the equity equally divided between the parties. The trial court also held that "[t]he parties are awarded the personal property which they now possess, including automobiles, guns and jewelry, and bank accounts, stocks, IRA's, or other holdings."

Wife asserts that the trial court ultimately awarded her 14.08% of the estate, Husband 25.47% of the estate, and omitted consideration of 60.45% of the estate. Wife maintains that the trial court erred in designating the Adams Avenue property as marital property. She argues that the trial court's division of the marital estate is inequitable particularly in light of her contribution to property allocated to Husband. For instance, Wife states that she sold her previous home before the marriage and that the proceeds helped to pay the mortgage on the Key West property that Husband had purchased before the marriage.

In addition, Wife argues that the trial court failed to allocate numerous other items of tangible and intangible personal property. Wife contends that the de facto result of the trial court's failure to make a determination regarding this property benefits Husband. She further claims that Husband

---

[1] Wife purchased the home with separate assets in contemplation of divorce and the trial court does not appear to consider this marital property.

owes her rent on the real property on Summer Avenue occupied by Husband's business during the pendency of the divorce. Wife states that her business paid the marital estate rent for its use of the Adams Avenue property, but that Husband's corporation failed to pay the estate for its use of the Summer Avenue property. Wife also asserts that she is entitled to the reasonable rental value of the marital home because she was "constructively evicted" by Husband due to his "conduct, threats, assaults and his refusal to leave."

The trial court's property division is reviewed *de novo* with a presumption that the trial court's factual findings are correct. *See Watters v. Watters*, 959 S.W.2d 585, 588 (Tenn. App. 1997); Tenn. R. App. P. 13(d). An appellate court may alter the trial court's division of property only if the trial court misapplies the law or if the evidence preponderates against the trial court's factual findings. *See Wade v. Wade,* 897 S.W.2d 702, 715 (Tenn. App. 1994).

Under Tennessee Code Annotated § 36-4-121, the court is directed to consider many factors in the division of marital property, including the length of the marriage, the age, employability, and earning capacity of the parties, and the contributions of each party to the marriage. *See* Tenn. Code Ann. § 36-4-121 (1996).

In *Harrington v. Harrington,* 798 S.W.2d 244, 245 (Tenn. App. 1990), this Court stated that the "ownership of the marital estate should be presumed to be equal until proven otherwise." In *Barnhill v. Barnhill,* 826 S.W.2d 443 (Tenn. App. 1991), the Court held:

> [M]arital property should be equitably divided without regard to fault. An equitable division, however, is not necessarily an equal one. Trial courts are afforded wide discretion in dividing the interests of the parties in jointly-owned property.

*Id.* at 449.

We first examine the trial court's allocation of the real property in the marital estate. The trial court allocated the Key West property and the marital home on Tutwiler to Husband and allocated the Adams Avenue property to Wife. The proceeds from the sale of the properties on Raleigh La-Grange, Summer Avenue, and Shelby Street were to be divided equally. This resulted in an effective distribution of 63.3% of the marital real property to Husband and 36.7% to Wife. Wife argues that this distribution is inequitable, particularly since the Buena Vista property, sold during the marriage, was owned separately by Wife and since she invested the sale proceeds in property allocated to Husband. Wife also states that she made other substantial contributions to property awarded to Husband. Finally, Wife notes that Husband signed the deed to the Adams

7

property over to her after the parties separated in an effort to save it from foreclosure. Wife then refinanced the property and paid the mortgage until she sold the property.

At the time the parties married, Wife sold her home on Buena Vista and moved into the marital home on Tutwiler. The marital home on Tutwiler, as well as the property in Key West, on Raleigh La-Grange Road, Summer Avenue, and Shelby Street, were all owned by Husband prior to the marriage. Evidence supports the trial court's finding that "[t]he Buena Vista sale netted $97,000 to Ms. Dix, which was invested in the Key West property." Following the marriage, the parties changed the deeds to all the property so that they jointly owned the property as tenants by the entirety. Wife, an attorney, proposed the idea. The trial court stated that:

> [t]he reason for these transactions is not completely clear. Ms. Dix contends it was done for love and affection as a consideration, and Mr. Carson contends it was done to cloud the titles, due to possible exposure in a pending lawsuit.

Wife testified that she made further contributions to the properties, financial contributions as well as other contributions such as repair, improvements, upkeep, and caring for tenants. During the marriage, the parties also purchased the Adams Avenue property for Wife's law practice. The trial court found that "[b]oth parties contributed to the money and improvements that went to" this property.

The evidence preponderates in favor of the trial court's distribution of the marital real property. The evidence supports the trial court's finding that Husband made substantial contributions to the Adams Avenue property, and also supports the trial court's designation of this realty as marital property. The trial court's equitable division of the real property is consistent with the factors set forth in Tennessee Code Annotated § 36-4-121(c). The factors favoring the trial court's allocation include the relatively short duration of the marriage, the fact that Wife is younger and likely has the higher earning capacity and has greater ability to acquire capital assets in the future, and the fact that most of the real property was owned by Husband before the marriage. *Id.*

In addition, the trial court noted that Wife owned more valuable separate property. *See id.* § 36-4-121(c)(6). The trial court stated:

> Ms. Dix testified that she had substantial assets before the marriage and presently has substantial holdings, including IRA's, and a lucrative law practice. On the other hand, Mr. Carson owned as his separate property all of the real estate involved in this litigation, except for Buena Vista, before the parties' marriage. He has no pension or retirement, and now owns nothing but the property awarded in this case.

It is unclear whether the trial court was influenced by Wife's recommendation that Husband convert the deeds of his property so that they shared an ownership interest as tenants by the entirety. Regardless, under all of these circumstances, the trial court acted within its "wide discretion" in allocating the real property in the marital estate. *Barnhill*, 826 S.W.2d at 449. The decision of the trial court on this issue is affirmed.

Wife alleges that a substantial portion of the personal property in the estate was not addressed by the trial court. However, the trial court expressly stated that "[t]he parties are awarded the personal property which they now possess, including automobiles, guns and jewelry, and bank accounts, stocks, IRA's, or other holdings." This holding appears to include the following personal property that Wife claims has not been addressed in Wife's Rule 15 listing of the martial assets: tools, equipment, various furnishings and household items, a car, a boat and a trailer. All of these items are located at the Key West property that was awarded to Husband. The items are in his possession and were covered by the trial court's holding above. After reviewing the record, we cannot conclude that the evidence preponderates against the trial court's decision. Therefore, the decision of the trial court is affirmed as to these items of personal property.

Wife also asserts that the trial court failed to address a number of intangible marital assets. Restraining orders in the record prohibited Husband "from disposing of, causing harm to, secreting, damaging or destroying any item of marital property . . ." and "from disposing of the proceeds from the sale of the parties' Rolls Royce automobile." Furthermore, Husband was ordered to deposit any rental income into an account managed by an agreed-upon certified public accountant. Bank accounts containing marital funds would be included in the trial court's restraining orders. The record indicates that Husband may have violated the provisions in the restraining orders throughout the pendency of the divorce. The trial court, however, found that "[a]ny money that was spent in violation of the various Restraining Orders was to preserve the marital assets of the parties and was accounted for, except for the balance of the attorney's fees awarded to the Guardian *Ad Litem*."

Therefore, the use of marital funds by Husband in violation of the above restraining orders would be covered by the trial court's ruling that the funds were used to preserve the marital estate. The following intangible assets in Wife's Rule 15 listing of marital property would be included in the trial court's finding: the Rolls Royce account, rental income from the parties' rental properties, loans from marital funds for Husband's construction business and taxes on that business, Husband's alleged diversion of joint marital rental funds and Wife's marital wages, loans to Husband from the parties' rental income account, condemnation proceeds for the Summer Avenue property, insurance checks received for damage to Tutwiler property, various investments made by Husband with marital funds, the purchase of a car with marital funds, and a loan to Husband from marital funds to bring the note on the Adams property current. Upon review of the record, we cannot conclude that the evidence preponderates against the trial court's holding. Consequently, the decision of the trial court is affirmed as to these items.

Wife asserts that the trial court also failed to make a disposition of over $12,000 in a Morgan Keegan account, over $30,000 in the Napolean Enterprises account, and $200,000 that Husband loaned to third parties at twenty-five percent interest. Husband admitted that in 1986, the year the parties married, the Napolean Enterprises account contained over $30,000 from his construction company. He claims that he subsequently lost this money. Husband also maintains that the money in the Morgan Keegan account was money earned from his construction company. The record is unclear whether the trial court found these funds to be marital or separate property. In addition, the distribution of these items is not covered by the trial court's findings discussed above. We remand these issues to the trial court to determine whether the funds in these accounts and the cash loaned out are marital property or separate property and distribute them accordingly.

Wife also claims that Husband owes her over $100,000 for 623 hours of legal work she performed for his business during their marriage and over $14,000 for a loan to Husband from her separate funds used to pay off Husband's car note. Wife stated that Husband agreed to pay her for these legal fees and reimburse her for the money she used to pay off his car, although she agreed to defer payment. These two items were not covered by the trial court's findings discussed above.

Because the issues involve credibility of witnesses, we must remand for the trial court to make a determination of whether Husband owes Wife these amounts.

Wife also seeks to have Husband reimburse her for expenses on the Adams Avenue property that exceeded the rental income. The trial court's order does not address this issue. However, the record contains no evidence that would support an award to Wife of these expenses. Therefore, Wife's petition for these expenses is denied.

Wife also asserted on appeal that Husband owed rent to the marital estate for his use of the Summer Avenue property for his business and that Husband owes her rent due to her "constructive eviction" from the marital home. The trial court specifically denied these requests in its findings by denying Wife's petition to have Husband and his corporation pay rent. The trial court also considered Husband's claims. For example, the trial court ruled that Husband was not entitled to recover his claim for $102,000 for reimbursement for repairs and management fees for the real property. After reviewing the record in this case, we affirm the trial court on these issues.

Wife also contends that the trial court erred by "failing to equitably consider and equitably render an accounting in compliance" with a March 1994 Consent Order, thus resulting in an inability to "properly adjust the equities in the marital estate." The order entered on March 31, 1994, states:

> the parties shall be ordered to complete an accounting with regard to the issues raised in the Petition [filed by Wife], specifically an accounting of rents and profits due on certain real property jointly owned by the parties.

In the order, the parties agreed that the accounting should be conducted by Certified Public Accountant (C.P.A.) Steve Walls ("Walls"). Wife notes that although she completed her accounting pursuant to the order, Husband failed to comply with the order. As a result, Wife argues that the trial court's distribution of the marital estate was skewed. Husband responds that he provided all the documentation that he could under the circumstances. Walls testified that both parties "supplied all the information [Walls] asked for."

After full review of the record, we find that there was sufficient evidence by which the trial court could divide the marital estate. During the course of the nine-day trial, there was ample testimony for the trial court to render its decision. The trial court acted within its discretion in making its decision without a formal accounting by Husband. The decision of the trial is affirmed on this issue.

Wife also appeals the trial court's decision regarding custody of McKenzie, her schooling

11

and past and future child support. The trial court awarded the parties "joint custody of McKenzie, with Ms. Dix being awarded physical custody." However, the trial court ordered that McKenzie continue spending alternating weeks with each parent, finding that this arrangement had proven "satisfactory in the development of the child." The trial court refused to order Husband to pay for any portion of McKenzie's tuition at St. Mary's Episcopal School, and declined to order payment of child support. It found that Husband's arrearages in child support were offset by his payment of other items for McKenzie, such as etiquette classes and piano lessons.

Husband argues that the trial court did not err in awarding the parties joint custody of McKenzie, contending that acrimony between the parties does not per se require reversal of an award of joint custody. He notes that the trial court found that the arrangement of alternating weeks had proven "satisfactory in the development of the child" and that the guardian ad litem, while recommending Wife have sole custody, also recommended continuing alternating weeks with each parent. Husband also contends that the trial court did not err in declining to require him to pay a portion of the St. Mary's tuition or to pay child support, claiming that he now earns less than $30,000 per year, considerably less than Wife's income from her law practice. Husband also argues that the trial court properly found that his child support arrearages were offset by his other expenditures for McKenzie.

We consider first the issue of custody. Wife argues that the trial court erred by awarding joint custody, and maintains that the arrangement of alternating weeks has not been in the child's best interest. Wife insists that, in fact, McKenzie has not been living with each parent on alternating weeks. Instead, Wife asserts that she has spent more time in Wife's care, because Husband often has been out of town, sometimes for extended periods of time. On these occasions, Wife says that Husband would simply tell Wife that she was responsible for taking care of the child during his absence. Wife alleges that many times Husband leaves town without telling Wife where he is going and where he can be reached. She contends that her efforts to contact Husband concerning their child have been rebuffed and that Husband refuses to speak with her about any topic, including McKenzie. It is undisputed that Husband has for significant periods blocked his telephone line from receiving any calls from Wife's residence.

Wife asserts that she is the more fit parent and should be awarded sole custody of the child. She maintains that she was McKenzie's primary caretaker during the parties' marriage. Wife alleges

that Husband has lied to McKenzie, has used illegal drugs, has a propensity for violence, and has had a tenant who is a drug user and convicted perjurer. Wife notes that the guardian ad litem recommended that she be awarded sole custody, and asks this Court to do so, with liberal visitation for Husband.

Husband asks this Court to affirm the trial court's holding on custody and the allocation of parenting time. He argues that both parents have been involved in McKenzie's care and that joint custody is therefore appropriate, despite the parents' inability to communicate. He maintains that the arrangement of alternating weeks has been in McKenzie's best interest, noting that the guardian ad litem recommended continuing this allocation of parenting time. Husband does not in his testimony dispute Wife's allegation that he has on occasion left town abruptly, sometimes for extended periods, leaving McKenzie in Wife's care. Nevertheless, he maintains that he has cared for McKenzie approximately sixty per cent of the time since the parties' separation. He does not dispute Wife's contention that he refuses to communicate with her on any issue, including McKenzie, and installed call blocking to block telephone calls from Wife's residence for a substantial period of time. However, he maintains that this is a result of Wife's harassing and excessive behavior, and argues that Wife is mentally ill.

In child custody cases, of course, the child's best interest is the primary consideration. *See* Tenn. Code Ann. § 36-6-106 (1996); *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. App. 1983). The Court has "the widest discretion" to fashion "a custody arrangement that is in the best interest of the child." Tenn. Code. Ann. § 36-6-101(a)(2). By statute, there is "neither a preference nor a presumption for or against joint legal custody, joint physical custody or sole custody . . . ." *Id.* Nevertheless, the practical problems of joint custody have been repeatedly acknowledged by this Court, particularly "where there is hostility and ill will between the parents." *Jones v. Jones*, No. 01-A-01-9601-CV00038, 1996 WL 512030, *4 (Tenn. App. Sept. 11, 1996); *see also Winchester v. Winchester*, No. 02A01-9604-CH-00092, 1997 WL 61508, *2 (Tenn. App. Feb. 14, 1997); *Malone v. Malone*, 842 S.W.2d 621, 623 (Tenn. App. 1992); *Dodd v. Dodd*, 737 S.W.2d 286, 289-90 (Tenn. App. 1987). Joint custody arrangements "depend for their success on a high degree of cooperation between the parents, so it is perhaps not surprising that they should frequently fail." *Jones*, 1996 WL 512030, at *5; *see also Winchester*, 1997 WL 61502, at *3.

The record in this case is replete with evidence of hostility and animosity between the parties.

13

This has resulted in a total absence of communication regarding McKenzie's well-being. While both parties are loving and involved parents, their enmity has created in essence a "parallel" parenting arrangement, in which each parent acts autonomously, with no joint cooperation, decisions, or planning for McKenzie's future. This is an unhealthy arrangement for the child, difficult with respect to day-to-day issues such as homework assignments and unworkable in the face of major decisions and plans for the child's future.

Husband rightly notes that, on rare occasions, this Court has affirmed an award of joint custody in a situation in which hostility existed between the parents. *See, e.g., DeVault v. DeVault*, 1996 Tenn. App. LEXIS 536 (Tenn. App. August 28, 1996). In *DeVault*, the father became involved with a "paramour" and moved out of the marital home. *See id.* at 1. The trial court awarded the parties joint custody, with primary physical custody with the mother. *See id.* at \*2. On appeal, the mother opposed the trial court's order of joint custody, arguing that joint custody was inappropriate in a case in which the parties "cannot get along." *See id.* The appellate court declined to reverse the order of joint custody, noting that the mother, who sought sole custody, was the source of most of the problems, because of her "feelings of being spurned by" the father. *See id.* at 3-4. The Court also felt it likely that:

> an award of sole custody to [the mother] would restrict [the father's] role in his children's lives. Such a restriction would be highly disruptive to the children because [the father] has been extraordinarily involved in his sons' lives in the past.

*Id.* at 4. Thus, the Court found that the mother should not be permitted to, by her behavior, make joint custody unworkable and then be awarded sole custody.

This case is in some ways the converse of *DeVault*. While both parties have contributed to the acrimony between them, Husband's conduct most directly affects the custody arrangement. While Husband maintains Wife's behavior forced him to do so, it is undisputed that Husband adamantly refuses to communicate with Wife, regarding McKenzie or any other topic. It is undisputed that Husband put call blocking on his telephone to block telephone calls from Wife. It is undisputed that Husband has repeatedly left town abruptly and simply expected Wife to quickly make arrangements to care for McKenzie. Thus, unlike *DeVault*, the party most responsible for making joint custody unworkable seeks to have it affirmed by this Court. It is clear in this case that joint custody is not feasible, and we therefore vacate the trial court's order on this issue.

We must therefore determine the party to whom sole custody should be granted. A

comparative fitness analysis is used to determine which parent should be awarded custody. *Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996). At the trial level, both parties sought sole custody. On appeal, Wife seeks sole custody and Husband seeks to have the award of joint custody affirmed. The trial court specifically found both parties to be fit parents.

In this case, as in many cases, both parties are loving and involved parents with significant drawbacks. Wife testified extensively regarding Husband's outbursts and volatile temper, his refusal to communicate with her, and that he had repeatedly left town with no notice and without informing Wife where he could be contacted. Husband does not dispute these claims, but maintains adamantly that Wife's harassment and excessive behavior forced such a response.

Husband also testified extensively regarding Wife's behavior, accusing her of mental illness, harassment, threats to him and to third parties. After Husband had call blocking installed on his telephone to block Wife's calls, he asserts that she called his pager over eighty times in a single day. Wife disputes these accounts, asserting that she has behaved reasonably throughout the litigation. However, this is belied by the record in this cause. Review of the record makes it clear that Wife, in representing herself, engaged in excessive and, at times, oppressive behavior and is primarily responsible for expanding this litigation into seventeen volumes of transcript as well as innumerable exhibits and pleadings. This fact must be taken into account as well.

On the whole, while both parties have significant virtues and vices, we must conclude that McKenzie's best interest would be served by awarding custody to Wife rather than Husband. To be certain, Wife's behavior makes the relationship between Husband and Wife difficult. However, it does not appear to directly affect her ability to parent McKenzie or to cooperate with Husband regarding McKenzie. On the other hand, Husband's refusal to communicate with Wife, his volatile outbursts, and his sudden decisions to leave town and assume Wife will care for McKenzie in his absence all directly affect his parenting and his ability to work cooperatively with Wife regarding

15

McKenzie and keep both parents involved. Consequently, we find that sole custody of McKenzie should be awarded to Wife.

We must now address the allocation of parenting time between the parties. Wife argues that Husband does not communicate with her regarding McKenzie's school assignments or extracurricular activities, and that Husband regularly left town suddenly without making arrangements in advance for Wife to care for McKenzie. Wife testified that Husband's behavior makes it difficult for her to monitor continuing homework assignments and plan for school activities at which parents are to be available and that it causes McKenzie to be insecure and stressed. She also disputes Husband's fitness as a parent, alleging that he has a propensity for violence, uses illegal drugs and consorts with felons and other undesirable persons. The trial court found both parents to be fit, and found that the arrangement of alternating weeks with each parent had "proven to be satisfactory in the development of the child." The guardian ad litem recommended Wife be awarded sole custody, but also recommended McKenzie continue spending alternate weeks with each parent.

It is undisputed that Husband has refused to communicate with Wife regarding McKenzie's schoolwork or any other topic, and that this has created difficulties. It is also undisputed that Husband has often taken unexpected trips out of town, causing McKenzie to be insecure and leaving Wife to care for her. However, it is also undisputed that Husband has been a loving parent and quite involved in McKenzie's activities.

The record indicates that the parties have been alternating weeks, with "changeover day" on Monday afternoons after school. On balance, it appears necessary to modify this arrangement during the school year to permit Wife to better monitor McKenzie's schoolwork and cope with Husband's refusal to communicate with her regarding McKenzie's activities. Visitation is modified so that, during the school year, Husband's visitation on alternate weeks shall begin on Wednesday afternoons after school and end upon bringing McKenzie to school the following Monday morning. In all other respects the visitation arrangement shall remain as ordered by the trial court, in particular regarding holidays, vacations and maintaining the arrangement of alternating weeks with each parent during the summer months.

On appeal, Wife also seeks child support. The trial court made no specific findings regarding the parties' income level, but in light of the order of joint custody and alternating weeks, ordered no payment of child support. The issue of child support must be remanded in light of this Court's

16

modification of the trial court's order on custody and visitation.

Wife also contends that the trial court erred by failing to require Husband to pay a portion of McKenzie's private school tuition and expenses at St. Mary's Episcopal School. At the time of trial, tuition for the school was $7,245 per year. Although the trial court found that McKenzie "has attended St. Mary's Episcopal School since she was old enough to enroll," it "decline[d] to order that the child attend St. Mary's." Wife argues that McKenzie is doing well at St. Mary's and that it is in her best interest to continue at St. Mary's in order to retain continuity with friends and teachers.

Husband has objected to McKenzie's continued enrollment in the private school, claiming an inability to pay and indicating some preference that she attend a co-educational school. Husband asserts that McKenzie should attend Grahamwood School, a public school with excellent credentials located close to Husband's residence. Wife notes that Husband enrolled McKenzie at St. Mary's and never voiced his disapproval of the school until after the parties separated and he was asked to pay a portion of the tuition. McKenzie has continued attending St. Mary's, with Wife paying all of the tuition.

The evidence in the record indicates that McKenzie has been excelling at St. Mary's, where she is accustomed to small, all-girl classrooms. The guardian ad litem recommended as follows:

> [I]t is in McKenzie's best interest that she continue at St. Mary's Episcopal School as long as possible, it being in McKenzie's best interest that she continue in a familiar, stable setting with familiar friends and teachers with the extremely high quality and diversity of the education that she is now getting, which will provide her with a strong foundation for her future development.

Although Husband now claims a preference that McKenzie attend a public, co-educational school, it is undisputed that, well prior to their separation, both parties believed it was in McKenzie's best interest to attend St. Mary's. Indeed, Husband notes that he enrolled McKenzie at St. Mary's in 1992, years before she would begin attending. It is undisputed that Husband has acquiesced in McKenzie continuing to attend St. Mary's, so long as Wife pays the tuition. Under these circumstances, the evidence preponderates against the trial court's holding that Husband not be required to contribute toward the St. Mary's tuition and expenses. We reverse the decision of the trial court on this issue and remand the issue to the trial court, to determine the portion of McKenzie's St. Mary's tuition and school expenses to be paid by Husband, along with the trial court's consideration of the overall issue of child support.

17

Wife contends on appeal that she is entitled to child support arrearages pursuant to the consent pendente lite order entered on February 2, 1994. The order states that Wife shall be reimbursed "for one half of all health insurance, medical expenses, day care . . . expenses, school activity and other school related expenses; clothing expenses; piano lessons, etc. for the minor child of the parties." The order also states that Husband may "offset against any such amounts for one-half of such expenses that he incurs and documents for the minor child." At trial, Wife maintained that Husband owed her $14,502.66 for these expenses. The trial court found that any arrearages owed by Husband were "set off by his expenditures on the child."

Wife argues that the trial court erred in setting off these amounts. Wife contends that Tennessee Code Annotated § 36-5-101(a)(5) bars Husband from setting off his child support obligation since he filed no petition for modification or relief from the 1994 order. Wife also maintains that Husband has not proven any offsets in accordance with the order. She notes that Husband admitted that he used marital funds for some of the items claimed as expenditures for McKenzie, and that he did not provide documentation of his claimed offsetting expenses.

Husband argues that during the pendency of the divorce, he kept McKenzie over sixty percent of the time and that he should be entitled to offset his expenditures on her behalf. Husband testified that his expenditures for McKenzie included etiquette classes, swimming lessons, piano lessons, tutors, entertainment, clothing, and other expenditures. Husband maintains that Tennessee Code Annotated § 36-5-101(a)(5) does not require a petition to be filed if the offsetting expenses are for necessities.

While a child support obligation cannot be modified retroactively, a petition for relief pursuant to § 36-5-101(a)(5) need not be filed in order to offset expenditures against child support arrearages. *See, e.g., Benson v. Benson*, No. 01-A-01-9601-CV00043, 1996 WL 284731, at *2 (Tenn. App. May 31, 1996); *Netherton v. Netherton*, No. 01-A-01-9208-PB00323, 1993 WL 49556, at *2 (Tenn. App. Feb. 26, 1993). Since execution of the 1994 order, the record contains only limited documentation of Husband's child-related expenditures. Husband has submitted a list of his expenses but has documentation of only a few. Although the consent order notes that Husband may offset expenses he incurs "and documents," the trial court was within its discretion to find that the expenses were actually incurred even in the absence of documentation. Husband asserted that he paid many of the expenses specified by the consent order, such as clothing expenses, piano lessons

18

and the like. The evidence does not preponderate against the trial court's decision. The trial court is affirmed on this issue.

Wife also argues that the trial court erred in not requiring Husband to obtain a $400,000 life insurance policy on himself. Life insurance is necessary, Wife maintains, to secure any child support obligations that Husband may be assessed. Husband testified at trial that he was basically in good health except for "certain aches and pains as any sixty year old man," but later testified that he was unable to obtain life insurance on himself. Tennessee Code Annotated § 36-5-101 provides that

> The court may direct either or both parties to designate the other party and the children of the marriage as beneficiaries under any existing policies insuring the life of either party and maintenance of existing policies insuring the life of either party, or the purchase and maintenance of life insurance and designation of beneficiaries.

Tenn. Code Ann. § 36-5-101(g) (Supp. 1997). Thus, the statute explicitly authorizes a trial judge to order a parent to obtain life insurance to secure child support obligations. "The legislature specifically left the determination of whether to order a party to procure insurance for the benefit of the other party and children of the marriage to the discretion of the trial court." *Young v. Young*, No. 01A01-9610-CH-00473, 1997 WL 910249, at *287 (Tenn. App. 1997). The trial court did not address whether life insurance is appropriate in this case. We remand for a determination on this issue, in light of the trial court's decision on an award of child support on remand.

Finally, Wife seeks compensation for her attorney's fees and for the costs of this litigation. "The decision to award attorney's fees to a party in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against such a decision." *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. App. 1992). In *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983), the Court held:

> The right to an allowance of legal expenses is not absolute. It is conditioned upon a lack of resources to prosecute or defend a suit in good faith. This rule is to enable the wife, when destitute of means of her own, to obtain justice and to prevent its denial. If a spouse does not have separate property of her own which is adequate to defray the expenses of suit, certainly she should not be denied access to the courts because she is unable to procure counsel.

*Id.* at 749 (citation omitted). The evidence supports the trial court's refusal to order either party to pay attorney's fees or court costs. The trial court is affirmed on this issue.

In sum, we affirm the trial court's decision to declare the parties divorced without granting a divorce to either. The trial court's division of the real property is affirmed. Likewise, we affirm the trial court's holding that personal property is awarded to the party who possesses it. Wife's

19

request for reimbursement of expenses on the Adams property is denied. The cause is remanded to the trial court for a determination regarding the Morgan Keegan and Napolean Enterprises accounts, the $200,000 loan, Wife's legal fees for representing Husband's corporation, and Wife's loan to Husband for his car note. In all other respects, the trial court's property division is affirmed. We find no error in the trial court's decision to divide the marital estate in the absence of a formal accounting by Husband. In view of the hostile relationship between the parties and Husband's refusal to communicate with Wife regarding their daughter, the trial court's award of joint custody is reversed and sole custody is awarded to Wife. In order to enable Wife to adequately monitor the parties' daughter's school work, the visitation arrangement is modified during the school year. During the school year, Husband's visitation on alternate weeks shall begin on Wednesdays after school and end Monday when he brings McKenzie to school. In all other respects, such as holidays, vacations and alternating weeks during the summer months, the visitation arrangement is affirmed. The cause is remanded to the trial court for a determination regarding child support in light of the modification of the trial court's order regarding custody and visitation. The trial court's decision not to require Husband to contribute toward the parties' daughter's private school expenses is reversed, and the cause is remanded to determine the appropriate portion of the child's tuition and expenses for St. Mary's Episcopal School to be paid by Husband. Furthermore, the cause is remanded to the trial court for a determination of whether life insurance on Husband's life is appropriate based on the facts of this case and this Court's modification of the visitation arrangement. The trial court's order on Husband's arrearage in child support, permitting him to offset the arrearage with other child-related expenditures, is affirmed. The trial court's refusal to require either party to pay the other's attorney's fees or court costs is affirmed. In all other respects, the decision of the trial court is affirmed.

20

The decision of the trial court is affirmed in part, reversed in part, modified and remanded as set forth above. Costs on appeal are taxed equally to both parties.

_____

_____HOLLY KIRBY LILLARD, J.

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**DAVID R. FARMER, J.**