IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2000 Session

## LOUIS ERNEST CUNNINGHAM v. CHERYL LYNNE CHEATHAM CUNNINGHAM

**Direct Appeal from the Chancery Court for Madison County**
**No. 53334     Joe C. Morris, Chancellor**

---

**No. W1999-02054-COA-R3-CV - Filed October 20, 2000**

---

This appeal involves a divorce after seven years of marriage.  The trial court granted the wife a divorce, divided the property, awarded the wife rehabilitative alimony and alimony *in solido*, awarded child support for the parties' minor child, established an educational trust fund, and ordered the husband to maintain life insurance for so long as he is obligated to pay child support.  On appeal, husband takes issue with all of the above and also raises the constitutionality of the child support guidelines.  In addition, wife takes issue with the failure of the trial court to award her litigation expenses.  We have determined that the trial court's judgment should be affirmed in part, reversed in part and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part,**
**Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S. and JOHN EVERETT WILLIAMS, SP. J., joined.

Kay Farese Turner and William E. Miller, Memphis, Tennessee; J. C. Cox, Jackson, Tennessee for the appellant, Louis Ernest Cunningham.

Mary Jo Middlebrooks, Jackson, Tennessee, for the appellee, Cheryl Lynne Cheatham Cunningham.

Paul G. Summers, Attorney General and Reporter; Stuart Wilson-Patton, Assistant Attorney General, for the State of Tennessee.

### OPINION

Dr. Louis Cunningham (Dr. Cunningham) and Cheryl Cheatham Cunningham (Ms. Cunningham) were married on October 20, 1990, and separated on July 15, 1995.  Divorce proceedings were instituted after the parties were married for seven years, and Ms. Cunningham was

awarded the divorce on the grounds of inappropriate marital conduct. The final divorce decree was entered on January 20, 1999. The parties were awarded joint custody of their daughter, Avery Cunningham (Avery), with Avery's primary domicile being with Ms. Cunningham. In the final divorce decree, Dr. Cunningham was given the privilege of exercising approximately 160 days of visitation with Avery.[1]

Dr. Cunningham is a board certified cardiologist and has practiced medicine since 1979. He is the sole practitioner at the Mid-South Heart Center, Inc., a professional corporation. Dr. Cunningham's gross earnings at the time of the divorce were approximately $82,000.00 a month, with a net of $52,000.00 per month. He currently pays court-ordered child support from a previous marriage.

Ms. Cunningham has a college degree in special education and is licensed to teach. Currently, Ms. Cunningham is a homemaker, but she was previously employed as a medical equipment salesperson and as the business administrator of the Mid-South Heart Center. Ms. Cunningham's salary ranged from $30,000.00 to $70,000.00 per year while working as a medical equipment salesperson, and her base salary at the Mid-South Heart Center was between $40,000.00 and $50,000.00 per year. Ms. Cunningham does not intend to work outside of the home, preferring instead to remain at home with Avery.

Dr. Cunningham came into the marriage with a separate estate which included a condominium in Nashville, Tennessee, and real estate in Jackson, Tennessee. Ms. Cunningham came into the marriage with no separate resources, no inheritances, and no separate money. In 1993, Dr. Cunningham began the Mid-South Heart Center, his thriving medical practice. Ms. Cunningham founded two businesses during the parties' marriage, Cunningham, Searcy and Associates in 1991 and Sheryl's Shuttle in 1994. Both of these business ventures failed.

The trial court awarded Ms. Cunningham the parties' house on Sunhaven Drive, the household furnishings and appliances therein, the 1994 Lexus, one-half of the parties' First Tennessee and Union Planters bank accounts, and one-half of the insurance policies[2] with Ameritus Insurance Company and Prudential Insurance Company. Further, the court awarded Ms. Cunningham her profit sharing in the Mid-South Heart Center and one-half of Dr. Cunningham's profit sharing in the same. Ms. Cunningham is responsible for the outstanding debts to Union Planters, Visa, and a Memphis law firm.

Dr. Cunningham was awarded the remainder of the marital assets, including the Mid-South Heart Center and its attached goodwill, and is responsible for the remaining marital debts.

---

[1] Specifically, the court provided Dr. Cunningham with visitation every weekend (Friday through Sunday), a half day on Avery's birthday, the whole day on his birthday and on Father's Day, alternating holidays (Easter, Memorial Day, Fourth of July, Labor Day, Thanksgiving), equal time at Christmas, and six weeks during the summer.

[2] Although this is the language of the trial court's decree, we assume Ms. Cunningham actually received one-half of the cash surrender value of the Ameritus policy and of the Prudential policies.

Additionally, the court ordered Dr. Cunningham to pay $450,000.00 as alimony *in solido*; $6,000.00 per month for seven years as rehabilitative alimony; $6,200.00 per month in child support; and $4,486.00 per month into a college educational trust fund for Avery. In its subsequent amended order of absolute divorce, the trial court also ordered Dr. Cunningham to maintain a life insurance policy of $900,000.00 for so long as he has any child support obligations.

Dr. Cunningham filed a motion for a new trial on September 1, 1999, alleging for the first time that the trial court's setting of child support based upon the child support guidelines was a violation of his constitutional rights guaranteed by the equal protection clauses of the United States and Tennessee Constitutions. The Attorney General submitted a brief in defense of the Tennessee Child Support Guidelines on October 8, 1999. A hearing on this matter was held on December 15, 1999, and the trial court denied the motion for new trial on December 30, 1999.

Dr. Cunningham is appealing the decision of the trial court, raising the following issues, as we perceive them, for this court's review:

1.   Whether the trial court erred in finding that the Mid-South Heart Center has a value of $1,300,000.00.

2.   Whether the trial court erred in awarding Ms. Cunningham $450,000.00 in alimony *in solido*.

3.   Whether the trial court erred in its division of marital property and liabilities.

4.   Whether the trial court erred in awarding Ms. Cunningham rehabilitative alimony.

5.   Whether the trial court erred in requiring Dr. Cunningham to pay cash child support of $6,200.00 per month due to his increased visitation.

6.   Whether the trial court erred in requiring Dr. Cunningham to contribute $4,486.00 per month toward a college educational trust fund for Avery in that such a requirement violates the equal protection clauses of both the United States and Tennessee Constitutions.

7.   Whether the trial court erred in failing to grant a downward deviation from the Tennessee Child Support Guidelines.

8.   Whether the trial court erred in requiring Dr. Cunningham to maintain life insurance of $900,000.00 for as long as he has a child support obligation.

Additionally, Ms. Cunningham raises the issue of whether the trial court erred in not awarding her litigation expenses. We will now address each issue in turn.

### *Valuation of the Mid-South Heart Center*

The valuation of a marital asset is a question of fact. It is determined by considering all relevant evidence, and each party bears the burden of bringing forth competent evidence. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *See Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995). On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

Both Dr. Cunningham and Ms. Cunningham retained experts to place a value on Dr. Cunningham's medical practice. Dr. Cunningham's expert testified that the value of the practice as of April 30, 1998, was $546,710.00. Ms. Cunningham's expert valued the Mid-South Heart Center at $1,059,947.00 as of April 30, 1998, of which $417,083.00 was attributable to goodwill. The trial court found that the value of the Mid-South Heart Center was $1,300,000.00. Ms. Cunningham conceded that $1,059,947.00 was the correct value of the medical practice as compared to the $1,300,000.00 she listed on her financial statement. Regarding the goodwill of the medical center, the court stated, "[t]he Mid South Heart Center, Inc. is awarded to Dr. Cunningham and any professional goodwill which is attached to the Heart Center. Dr. Cunningham is a sole practitioner, and the goodwill is not a marital asset which the Court has considered."

In a professional practice, as well as in a sole proprietorship business, the success of the business is dependent on the owner thereof. The physical and tangible assets of a business have ascertainable value; however, the goodwill of a business, although essentially a thing of value, does not have a property interest separate from the business itself. Goodwill is, in essence, the reputation of the professional practice. The reputation of the practice, hence its goodwill, is valuable to the owner of the practice, and it cannot be separately sold or pledged. This court addressed the issue of the valuation of goodwill as a marital asset in *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985). In *Smith*, we said that professional goodwill is not a marital asset to be considered in making an equitable distribution of the marital estate. Accordingly, we have determined that the evidence preponderates against the trial judge's finding that the value of the Mid-South Heart Center is $1,300,000.00. Ms. Cunningham's expert testified that the value of the Mid-South Heart Center was $1,059,947.00. The expert attributed $417,083.00 of that amount to the goodwill of the professional practice. By this court's calculations, then, the value placed on the Mid-South Heart Center by Ms. Cunningham's expert, without the allowance for goodwill, is $624,864.00. Dr. Cunningham's expert testified that the value of the professional practice was $546,710.00. The expert did not factor goodwill into his valuation, thus, the $546,710.00 figure reflects the value Dr. Cunningham's expert placed on the professional practice without an allowance for goodwill. For the foregoing reasons, we reverse and remand this issue to the trial court for an assignment of value to the Mid-South Heart

Center within the range of values supported by the evidence, namely between $546,710.00 and $624,864.00.

### *Alimony in Solido*

Whether an alimony award is appropriate is dependent on the facts and circumstances of each case. While the alimony analysis is factually driven, the court must also balance several statutory factors including those enumerated in section 36-5-101(d) of the Tennessee Code.[3]

---

[3]Section 36-5-101(d) provides

(d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
> (C) The duration of the marriage;
> (D) The age and mental condition of each party;
> (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
> (G) The separate assets of each party, both real and personal, tangible and intangible;
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;
> (I) The standard of living of the parties established during the marriage;
> (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
> (L) Such other factors, including the tax consequences to each party, as

(continued...)

-5-

Although all statutory factors listed in section 36-5-101(d)(1) are important and are considered by the trial court, need and the ability to pay are the critical factors in setting the amount of an alimony award. *See Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998); *Long v. Long*, 957 S.W.2d 825 (Tenn. Ct. App. 1997); *Luna v. Luna*, 718 S.W.2d 673 (Tenn. Ct. App. 1986).

Section 36-5-101(d)(1)(H) of the Tennessee Code lists the division of marital property as a factor to be considered by the trial court when it determines an alimony award. In the instant case, the trial court divided the marital assets and liabilities as follows:

| Recipient | Assets | Liabilities | Net Award | Distribution |
|---|---|---|---|---|
| Appellant | $1,655,593.05 | ($365,560.00) | $1,290,033.05 | 78.5% |
| Appellee | $371,621.34 | ($18,980.00) | $352,641.34 | 21.5% |
| **Totals** | $2,027,214.39 | ($384,540.00) | $1,642,674.39 | |

After dividing the marital estate, the trial court awarded Ms. Cunningham alimony *in solido* in the amount of $450,000.00. Based upon the fact that under section 36-5-101(d)(1)(H) of the Tennessee Code the division of marital property is a factor in determining an alimony award and that Dr. Cunningham's medical practice was valued incorrectly, we reverse the trial court's award of alimony *in solido*. We remand this case for a redetermination of alimony in light of our decision regarding the valuation of the Mid-South Heart Center.

### *Division of Marital Property*

After characterizing the parties' property as either marital or separate, the trial court makes an equitable division of marital assets. An equitable division of property does not necessarily mean an equal division. *See Bookout v. Bookout*, 954 S.W.2d 730 (Tenn. Ct. App. 1997); *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). In determining what constitutes an equitable division of marital assets, the court must consider the factors listed in

---

[3](...continued)
are necessary to consider the equities between the parties.

(2) An award of rehabilitative, temporary support and maintenance shall remain in the court's control or the duration fo such award, and may be increased, decreased, terminated, or extended, or otherwise modified, upon a showing of substantial and material change in circumstances. Rehabilitative support and maintenance shall terminate upon the death of the recipient. Such support and maintenance shall also terminate upon the death of the payor unless otherwise specifically stated. The recipient of the support and maintenance shall have the burden of proving that all reasonable efforts at rehabilitation have been made and have been unsuccessful.

Tenn. Code Ann. § 36-5-101(d) (1999).

section 36-4-121(c) of the Tennessee Code.[4]  The trial court is granted broad discretion in adjusting and adjudicating the parties' interest in all jointly owned property.  Its decision regarding division of the marital property is entitled to great weight on appeal.  ***Watters v. Watters***, 959 S.W.2d 585, 590 (Tenn. Ct. App. 1997).  The fairness of the property division is judged upon its final results.

Section 36-4-121(c)(1) of the Tennessee Code is noteworthy.  This section makes the duration of the marriage a factor the trial court can consider in determining the distribution of marital property.  Where the marriage is of a short duration, "it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place." ***Batson***, 769 S.W.2d at 859 (citing ***In re Marriage of McInnis***, 62 Or. App. 524 P.2d 942, 943 (1983)).  In cases involving a marriage of relatively short duration, each spouse's contributions to the accumulation of marital assets is an important factor.  ***See Batson***, 769 S.W.2d at 859 (citing ***In re Marriage of Peru***, 641 P.2d 646, 647 (Or. Ct. App. 1982)).

The court below based its decision concerning the division of marital property on an incorrect valuation of a major asset, the Mid-South Heart Center.  This court notes that changing the value of the medical practice will substantially change the distribution of marital property.  This court also notes that the Cunninghams were married for only a little less than five years prior to the parties' separation in July, 1995.  For the foregoing reasons, this court finds it

---

[4]Section 36-4-121(c) of the Tennessee Code states

In making equitable division of marital property, the court shall consider all relevant factors including:
> (1)  The duration of the marriage;
> (2)  The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3)  The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4)  The relative ability of each party for future acquisitions of capital assets and income;
> (5)  The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6)  The value of the separate property of each party;
> (7)  The estate of each party at the time of the marriage;
> (8)  The economic circumstances of each party at the time the division of property is to become effective;
> (9)  The tax consequences to each party; and
> (10)  Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (1999).

necessary to reverse the trial court's division of marital property and remand this case for a determination of a fair property division in light of the new value given to the medical practice.

### *Rehabilitative Alimony*

An award of rehabilitative alimony must be predicated upon a finding that the recipient spouse can be economically rehabilitated. *See* Tenn. Code Ann. § 36-5-101 (1999). Whether the recipient spouse can be rehabilitated must be determined according to "[t]he standard of living of the parties established during the marriage." Tenn. Code Ann. § 36-5-101(d)(1)(I) (1999); *see Robertson v. Robertson*, No. E2000-01698-COA-RM-CV, 2000 WL 1211314, at *2 (Tenn. Ct. App. Aug. 25, 2000), *perm. app. pending*. A court does not reach the issue of rehabilitation unless the recipient spouse is economically disadvantaged relative to the other spouse. If the recipient spouse is found to be disadvantaged relative to the other spouse, the trial court should determine the nature, amount, length, and manner of payment of alimony. Once awarded, rehabilitative alimony may be modified.

> An award of rehabilitative, temporary support and maintenance shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances. . . . The recipient of the support and maintenance shall have the burden of proving that all reasonable efforts at rehabilitation have been made and have been unsuccessful.

*Crabtree v. Crabtree*, 16 S.W.3d 356, 359 (Tenn. 2000) (citing Tenn. Code Ann. § 36-5-101(d)(2)(1999)) (emphasis omitted). The trial court found that Ms. Cunningham's rehabilitation was possible. That conclusion is supported by the record, and it is clear to us that Ms. Cunningham is economically disadvantaged relative to Dr. Cunningham. Section 36-5-101(d)(1)(H) of the Tennessee Code, however, makes the division of marital property a factor in determining the proper amount to award as alimony. Because we have previously found that the trial court erred in its valuation of Dr. Cunningham's medical practice, this court finds it only just that we reverse the trial court's award of rehabilitative alimony and remand this cause for a determination of alimony in light of the new valuation of the Mid-South Heart Center.

### *Child Support*

Dr. Cunningham raises two issues regarding child support: (1) whether the trial court erred in requiring him to pay $6,200.00 per month due to his increased visitation; and (2) whether the trial court erred in failing to grant a downward deviation from the guidelines. We will discuss each issue below.

While the trial court's findings of fact are entitled to a presumption of correctness on appeal, the lower court's discretion is tempered by the child support guidelines. Tenn. R. App. P. 13(d); *Jones v. Jones*, 930 S.W.2d 541, 544 (Tenn. 1996). Statutory authority provides for a

rebuttable presumption that the percentage amount of child support provided in the guidelines is the correct amount. However, "[the guidelines] are subject to deviation upward or downward when the assumptions on which they are based do not pertain to a particular situation." *Nash v. Mulle*, 846 S.W.2d 803, 805 (Tenn. 1993). In order to justify a deviation from this amount, the trial court must make written findings outlining the reasons for this deviation. These reasons must show that the deviation is either in the best interest of the child; that the child support guidelines would be unjust or inappropriate; or that a deviation is needed to maintain equity between the parties. *See* Tenn. Code Ann. § 36-5-101(e)(1) (1999). In *Jones v. Jones*, the Tennessee Supreme Court discussed when such deviations were appropriate:

> While § 36-5-101(e)(1) does authorize deviation in order to ensure equity between the parties, and while downward deviation is clearly not prohibited, the trial court's authority to do so must be considered in light of the provisions dealing with such deviation – Rule 1240-2-4-.04(2) and (4). Although not exclusive, those subsections provide for downward deviation in three instances: (1) where DHS has taken custody of the child(ren) pursuant to a neglect, dependency, or abuse action; (2) where the child(ren) spend more visitation time with the obligor than is assumed by the guidelines; and (3) in cases in which the obligor is subjected to an "extreme economic hardship," such as where other children living with the obligor have extraordinary needs. Therefore, the guidelines expressly provide for downward deviation where the obligee has utterly ceased to care for the child(ren); where the obligee clearly has a lower level of child care expense than that assumed in the guidelines; and where the obligor is saddled with an "extreme economic hardship." Although the rule does not purport to set forth an exhaustive list of instances in which downward deviation is allowed, these specific instances nevertheless are a powerful indication as to the types of situations in which it is contemplated under the guidelines.

*Jones*, 930 S.W.2d at 545 (emphasis omitted).

Pursuant to the statutory guidelines, the court can authorize a downward deviation if it finds that the child's overnight time is divided more equally between the parents. *See* Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.02(6) (1997). In situations where the overnight time is more equally divided between the parents, the court will make a case-by-case determination as to the appropriate amount of support; however, a downward deviation from the guideline amount is in the court's discretion:

> If the child(ren) is/are not staying overnight with the obligor for the average visitation period of every other weekend from Friday evening to Sunday evening, two weeks during the summer and two weeks during holiday periods throughout the year, then an amount shall be added to the percentage calculated in the above rule to compensate the obligee for the cost of providing care for the child(ren) for the amount of time during the average visitation period that the child(ren) is/are

> not with the obligor.  The court *may* consider a downward deviation from the
> guidelines if the obligor demonstrates that he/she is consistently providing more
> care and supervision for the children than contemplated in the rule.

Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.04(1)(b) (1997) (emphasis added) (citations omitted).  "In deviating from the guidelines, primary consideration must be given to the best interest of the child(ren) for whose support the guidelines are being utilized."  Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.04(5) (1997); *see also Contreras v. Ward*, 831 S.W.2d 288, 289 (Tenn. Ct. App. 1991).

> The guidelines further provide as follows:

> The court must consider all net income of the obligor as defined according to
> 1240-2-4-.03 of this rule.  The court must order child support based upon the
> appropriate percentage to the custodial parent up to a net of $10,000 per month of
> the obligor's income.  When the net income of the obligor exceeds $10,000 per
> month, the court *may* consider a downward deviation from the guidelines if the
> obligor demonstrates that the percentage applied to the excess of the net income
> above $10,000 a month exceeds a reasonable amount of child support based upon
> the best interest of the child and circumstances of the parties.

Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.04(3) (1997) (emphasis added).

In the instant case, the trial court determined the amount Dr. Cunningham was required to pay in child support as follows:

| | |
|---|---|
| $991,459.00 | Gross Wages |
| - 362,422.00 | Tax |
| $629,037.00 | |
| -   4,055.00 | Social Security Tax |
| $624,982.00 | |
| -  14,377.00 | Medicare Tax |
| $610,605.00 | Net Income |
| x       21% | Guideline Percentage for One Child |
| $128,227.00 | Annual Child Support |
| ÷       12 | |
| $ 10,686.00 | Monthly Child Support |

The trial court ordered that $6,200.00 of the $10,686.00 monthly child support be paid directly to Ms. Cunningham, and that the remaining $4,486.00 be put into a college educational trust fund. Dr. Cunningham argues that this amount of child support is incorrect for two reasons.  First, he argues that the guidelines provide for child support up to a net of $10,000.00 per month of his income.  The trial court below based Dr. Cunningham's child support obligation upon 21% of his

net income. Dr. Cunningham argues that the trial court should have set his child support obligation based upon 21% of a net of $10,000.00 per month, or $2,100.00. Secondly, Dr. Cunningham argues that he is entitled to a downward deviation from the guideline amount because he exercises above average visitation with his daughter as compared to that contemplated by the guidelines.

We must remember that child support determinations are made with the child's best interest in mind, not the best interests of the custodial and non-custodial parents. After a thorough review of the language of the guidelines, this court cannot determine that the trial court abused its discretion in not ordering child support based upon a monthly net income of $10,000.00. Dr. Cunningham's child has been accustomed to a very high standard of living all of her life, and the intent of the guidelines is to ensure that the economic impact on the child is minimized when the parents live separately and, to the extent that one parent enjoys a higher standard of living, that the child enjoys in that higher standard. *See Barnett v. Barnett*, E1997-00010-SC-R11-CV, 2000 WL 1246453, at \*4 (Tenn. Sept. 5, 2000). Additionally, Dr. Cunningham has the ability to pay child support in the manner determined by the trial court. Because the statute clearly provides trial courts with the discretion to set child support payments based on a monthly net income in excess of $10,000.00, this court finds that the trial court did not improperly determine Dr. Cunningham's net income nor did it improperly determine the amount of child support Dr. Cunningham is obligated to pay. We now turn to the issue of whether Dr. Cunningham's child support obligation should be reduced in light of his increased visitation with Avery.

The guidelines clearly provide that the trial court may consider a downward deviation from the guideline amount where the non-custodial parent is exercising more visitation than that contemplated in the guidelines. *See* Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.04(b) (1997). Additionally, the Tennessee Supreme Court, in *Jones v. Jones*, 930 S.W.2d 541, 545 n.5 (Tenn. 1996), stated, "[i]f the child(ren) spend more time with the obligor than is assumed by Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(6), . . . the obligor's child support payments should be reduced." We agree. The child support guidelines assume that a non-custodial parent will exercise 80 days of visitation with the minor child(ren), and the amount of support provided for in the guidelines is based upon such a visitation schedule. In the case at bar, the trial court provided Dr. Cunningham with the privilege to exercise approximately 160 days of visitation with Avery.[5] We must presume, until the evidence proves otherwise, that Dr. Cunningham is exercising this 160 days of visitation with his minor daughter. For the foregoing reasons, this court reverses the trial court's determination of child support, and we remand for a downward deviation based upon Dr. Cunningham's increased visitation with Avery. Additionally, the trial court shall make written findings to this effect.

---

[5] See *supra* note 1 for the court ordered visitation schedule.

### *Educational Trust Fund*

The child support guidelines give the trial court the discretion to establish an educational trust fund as a form of child support where the obligor parent's net monthly income is in excess of $10,000.00. *See* Tenn. Comp. R. & Regs. tit. 10, ch. 1240-2-4-.04(3) (1997) ("The court may require that sums paid above the percentage applied to the net income above $10,000 be placed in an educational or other trust fund for the benefit of the child."). The trial court below ordered that $4,486.00 of the $10,686.00 monthly child support be paid by Dr. Cunningham into a college educational trust fund for Avery. Dr. Cunningham argues on appeal that requiring him to pay $4,486.00 per month into a college trust fund is unconstitutional in that such a requirement violates the equal protection provisions of both the United States and Tennessee Constitutions.

At trial, Dr. Cunningham testified as follows:

Q. Now, in regard to the support of Avery, do you intend to support Avery?

A. Yes, I intend to support Avery and I'm certainly going to do whatever the Court requires of me and the record shows that I'll do over and above what the Court requires of me in regard to Avery's welfare. . . .

. . . .

Q. Do you intend to provide life insurance for her?

A. Yes.

Q. Now, although you wouldn't legally be required to pay her college education, what would you like to do in that regard, as far as supporting her?

A. Well, you know, I certainly have my dream and vision for Avery to go to college and beyond and I want that to be possible. You know, to my way of thinking, the best way to do that would be through a *trust fund* so that it could start now and be there for Avery and be enough for Avery when she gets to college. . . .

Q. ***Would you like for the Court to provide for that trust fund with some of the child support?***

A. ***Yes***.

It is apparent that the trial court did exactly what Dr. Cunningham requested the court to do – establish an educational trust fund with some of the funds allotted for child support. We determine, based upon the evidence deduced at trial, that Dr. Cunningham waived his constitutional argument, and thus, we decline to address the constitutionality of the child support guidelines on this appeal.

*Life Insurance*

Section 36-5-101(g) of the Tennessee Code provides

> The court may direct either or both parties to designate the other party and the children of the marriage as beneficiaries under any existing policies insuring the life of either party and maintenance of existing policies insuring the life of either party, or the purchase and maintenance of life insurance and designation of beneficiaries.

Tenn. Code Ann. § 36-5-101(g) (1999).

In *Young v. Young*, 971 S.W.2d 386 (Tenn. Ct. App. 1997), this court was faced with the issue of whether the trial judge erred in ordering Mr. Young to purchase and maintain a $50,000.00 life insurance policy to secure his alimony and child support payments. Judge Highers, writing for this court, held

> [b]ecause [section 36-5-101(g) of the Tennessee Code] expressly provides that the trial judge may direct a party to purchase and maintain a life insurance policy for the benefit of the other party and children of the marriage, the legislature specifically left the determination of whether to order a party to procure insurance for the benefit of the other party and children of the marriage to the discretion of the trial court. We will not interfere with the trial court's exercise of its discretion absent a showing of abuse.

*Id.* at 392. We find no abuse of discretion by the trial court in ordering Dr. Cunningham to maintain a $900,000.00 life insurance policy to secure his child support payment. However, because we have reversed and remanded the lower court's determination of child support in light of Dr. Cunningham's increased visitation, we must reverse and remand this issue to the trial court for a determination of the proper amount of life insurance once it determines the proper amount of child support consistent with this opinion.

*Litigation Expenses*

Trial courts have the discretion to award additional sums to defray the legal costs resulting from a divorce proceeding. *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983); *Palmer v. Palmer*, 562 S.W.2d 833, 838-39 (Tenn. Ct. App. 1977). In divorce cases, awards for litigation expenses are considered alimony *in solido*, *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), and are appropriate when one spouse is economically disadvantaged, lacks sufficient resources with which to pay attorney's fees, or would be required to deplete one's resources. *See Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994). Ms. Cunningham will receive a substantial sum as a result of the modified division of marital property and alimony. We believe these

-13-

awards will provide Ms. Cunningham with sufficient resources to pay her litigation expenses. Accordingly, we affirm the trial court's decision not to award attorney's fees to Ms. Cunningham.

### *Conclusion*

For the foregoing reasons, we affirm in part and reverse in part the decision of the trial court. In summary, we remand the case to the trial court for the valuation of the Mid-South Heart Center consistent with this opinion; the redetermination of alimony *in solido* and rehabilitative alimony in light of the new valuation of the Mid-South Heart Center; the division of marital assets based upon the new valuation of the Mid-South Heart Center; the redetermination of child support after a downward deviation due to the increased visitation of Avery by Dr. Cunningham and for written findings to that effect; and lastly for the determination of the proper amount of life insurance Dr. Cunningham shall be required to maintain based upon the redetermination of his child support obligation. We tax the costs of this appeal equally to both parties, Dr. Louis Cunningham and Ms. Cheryl Cunningham, and their sureties, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE